COURT OF APPEALS OF VIRGINIA


Present: Judges Benton, Coleman and Lemons[*]
Argued at Richmond, Virginia


TIMOTHY ROME BAKER, JR.

                                    MEMORANDUM OPINION[**] BY
v.   Record No. 1089-99-2          JUDGE DONALD W. LEMONS
                                         MARCH 21, 2000
FREDERICKSBURG DEPARTMENT
 OF SOCIAL SERVICES


        FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
                    John W. Scott, Jr., Judge

            (Donald R. Skinker, on brief), for appellant.
            Appellant submitting on brief.

            Joseph A. Vance, IV (Timothy W. Barbrow;
            Joseph A. Vance, IV & Associates, on brief),
            for appellee.


     Timothy Rome Baker, Jr. appeals the decision of the circuit

court terminating his parental rights to his three children,

Antonio Lewis, Shakela Lewis and Ervin Lewis.  On appeal, Baker

contends that the Fredericksburg Department of Social Services

(DSS) failed to prove by clear and convincing evidence that

Baker is not reasonably likely to correct or eliminate the

     [*] Justice Lemons prepared and the Court adopted the opinion
in this case prior to his investiture as a Justice of the
Supreme Court of Virginia.

     [**] Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

conditions that resulted in the abuse of his children so as to allow their safe return to him.  Finding no error, we affirm.

## I.   BACKGROUND

Three children were born to Baker and Teresa Lewis: Antonio in 1989, Shakela in 1991 and Ervin in 1993.  The evidence revealed that Baker was serving jail time for possession of cocaine with intent to distribute on February 21, 1996 when DSS intervened because of concerns that the youngest child had been sexually abused.  Further investigation revealed that the youngest child was "demonstrating very sexualized behavior with other children" in his Head Start program, and a medical examination indicated that he had been sexually abused. The medical examination showed that the second child had been sexually abused vaginally and anally.  The oldest child was characterized as being aggressive, "fail[ing] to comply in the classroom" and as "a very angry young man."  He was also described as having "sexualized behaviors" such as "sexual talk" and "knowledge."

To prevent removal, Lewis was offered various services, including homebuilder services, child protective services, a referral to individual counseling, medication management and a parenting skills class.  Since Lewis could not assure the children's safety in her home, however, DSS removed the children from her custody on October 24, 1996 and placed them into three separate foster homes.

-

In December of 1996, DSS designed a foster care plan for Lewis and the children. The plan called for her to obtain full-time employment, attend the Fresh Start program, complete parenting classes, undergo individual counseling and a psychological evaluation, make her home safe by removing other adults from the home, secure independent housing and learn how to provide necessary medications as directed. The goal of the plan was for the children to be returned home.

Baker was released from prison in February of 1997, secured part-time employment with a landscaping company and moved into a residence with Lewis. Although the service plan referred only to Lewis, Baker appeared in the juvenile court on September 11, 1997, and indicated that he had no objection to the foster care plan. In the meantime, Baker had supervised and unsupervised visitation rights with his children.

In February of 1998, the goal of the foster care plan was changed to adoption based on the parents' failure to establish appropriate housing over the previous one and a half years, Lewis' inability to protect the children from future abuse, Baker's failure to complete any item listed in the initial service plan, the parents' failure to address the issues leading to the removal of their children, Lewis' inability to set limits and interact with her children during visits and Baker's infrequent visits since his release from jail.

-

In April of 1998, Baker attended two classes on the traumatic effects of sexual abuse on children and one counseling session with a mental health therapist.  Baker attended eight of the nine weekly basic parenting classes between August 25, 1998 and October 20, 1998.  Georgette Cromartie, the teacher of the basic parenting classes, testified that Baker's score on a parenting skills test improved from forty-two percent prior to the class to seventy percent after completion of the class.  She also noted, however, that any score less than eighty percent was not a passing grade and was cause for concern.  During the nine weeks of classes, Cromartie told her students that anyone not scoring an eighty percent on the post-test needed to retake the class, and she testified that the client was responsible for making the arrangements for taking the class again.  When Baker received his score, Cromartie told him that she was not finished working with him.  Baker did not retake the class.

Mental health therapist Florence Duke provided counseling to Baker and Lewis but testified that Baker did not undergo any of the evaluations required under the foster care plans.  Baker told her that he could not afford to comply with the requirements.  Dr. Susan Rosebro, the counselor who conducted a parent competency evaluation of Lewis, testified, however, that funding was provided for that evaluation and that Baker failed to contact her.  Furthermore, Baker did not attend the Fresh Start program as required by DSS's service plan.

-

DSS had concerns about Baker's ability to provide care and protection of his children. Mary Elizabeth McGhee, the children's counselor since November of 1996, testified that she would be concerned for their welfare if they were in an environment of inadequate supervision or structure and that the children were making progress in their current living situations. Cromartie testified that the children needed a safe and stable environment, and she expressed concern that Baker and Lewis resided with "someone that they didn't know the name of." The children's high level of needs further required that their care provider have a high level of parenting skills and a highly structured environment, neither of which, in DSS's opinion, Baker could provide.

At the February 3, 1999 hearing, Baker was employed full time with health and dental benefits for the children, but there was no evidence that stable housing was obtained. Baker and Lewis were evicted in September 1998 for nonpayment of rent. At the time of the hearing, the couple was renting a bedroom in a house from a woman and her adult godson.

## II. SUFFICIENCY OF THE EVIDENCE

Pursuant to Code § 16.1-283(B)(2), the parental rights of parents of abused children may be terminated if the court finds by clear and convincing evidence that, inter alia, it is not reasonably likely that the conditions which resulted in the neglect or abuse can be substantially corrected or eliminated so

-

as to allow the children's safe return to their parents within a reasonable period of time. Proof that "[t]he parent or parents, without good cause, have not responded to or followed through with appropriate, available and reasonable rehabilitative efforts on the part of social, medical, mental health or other rehabilitative agencies designed to reduce, eliminate or prevent the neglect or abuse" is prima facie evidence of the conditions set out in Code § 16.1-283(B)(2). Code § 16.1-283(B)(2)(c).

"When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991). "In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990). In making its determination, the trial court must remember that

> the termination of the legal relationship between parent and child is a grave proceeding. A court order terminating parental rights renders the parent "a legal stranger to the child" and severs "all parental rights." Shank v. Dept. of Social Services, 217 Va. 506, 509, 230 S.E.2d 454, 457 (1976). [The Supreme Court of Virginia's] prior decisions clearly indicate a respect for the natural bond between children and their natural parents. The preservation of the family, and in particular the parent-child relationship, is

-

> an important goal for not only the parents
> but also the government itself.  While it
> may be occasionally necessary to sever the
> legal relationship between parent and child,
> those circumstances are rare.  Statutes
> terminating the legal relationship between
> parent and child should be interpreted
> consistently with the governmental objective
> of preserving, when possible, the
> parent-child relationship.

Weaver v. Roanoke Dept. of Human Res., 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980).

On appeal, we presume that the trial court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley, 9 Va. App. at 329, 387 S.E.2d at 796.  We view the decision in the light most favorable to DSS as the party prevailing below, and its evidence is afforded all reasonable inferences fairly deducible therefrom.  See Logan, 13 Va. App. at 128, 409 S.E.2d at 463.  The trial court's judgment, "'when based on evidence heard ore tenus, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. (citation omitted).

This record clearly demonstrates that the children had special needs because of their history of abuse and required a greater amount of supervision.  According to the testimony of the children's counselor, to meet the needs of all three children, Baker and Lewis would have to maintain a highly structured and supervised environment, support and cooperate

-

with the children's counselors and teachers, support the children socially, firmly set limits with respect to the children's behavior, support the children in the area of sexual development and become involved in school activities. The goal of DSS's initial foster care plan was to return the children to their parents. Among other requirements, the parents were to take a parenting skills class, make their home safe for the children by removing other adults from the home, attend individual counseling, and obtain full-time employment and independent housing.

Although Baker was released from prison in February of 1997, when the foster care plan's goal changed to adoption in February of 1998, he had not yet complied with any of the plan's requirements. While Baker eventually took a sufficient number of parenting skills classes, the evidence revealed that he failed to achieve a passing score on the post-test and did not retake the class when it was made clear to him that he should. Baker did not undergo any of the evaluations required under the foster care plans because he claimed that he could not afford them. Dr. Rosebro, however, testified that funding was available. Neither parent completed the Fresh Start program as prescribed by the service plan.

The record also demonstrates that Baker and Lewis were unable to provide both the necessary support and structured environment their children need. The parents failed to address

-

the issues that led to the removal of their children.  With respect to Lewis, Dr. Rosebro questioned her ability to protect her children from future abuse.  Furthermore, Baker visited his children "on a very limited basis" since his release from prison.  Finally, although Baker was employed full time when the hearing occurred, there was no evidence that the parents had obtained stable housing.  Baker and Lewis had been evicted in September of 1998 for nonpayment of rent from a home where they resided with people whom they did not know.  By the February hearing, Lewis testified that she and Baker rented a bedroom in the house of an older woman and her adult godson.  Baker and Lewis did not know the godson.

Based upon all of the information available to DSS, it was concerned that the children would not be protected any better on February 11, 1998 than they had been in October of 1996.  The children were reported to have made "remarkable" progress in the foster care system and advancements had been made in the areas of behavioral modification and sexual behavior and that heightened parenting skills were necessary to maintain this progress.  It was further reported that the children continue to be "high needs" children.  The children's counselor testified that the children's behavioral problems have improved with counseling and that their social skills are improving.

It is noteworthy that Baker does not attack the findings that the children were neglected and abused.  Nor does he deny

-

that such neglect and abuse "present[s] a serious and substantial threat to [their] li[v]e[s], health or development." Code § 16.1-283(B)(1).  Baker only argues that the proof fails to show that it is not reasonably likely that the condition that resulted in the neglect and abuse was not substantially corrected or eliminated so as to allow their safe return to his custody.  The evidence clearly and convincingly demonstrates otherwise.

Finding no error, the order of the trial court terminating Baker's parental rights is affirmed.

Affirmed.